IN UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TREMAIN HALL<br>1879 Brookhaven Drive<br>Lima, Ohio, 45805 | )<br>)<br>) | CASE NO.<br><br>JUDGE: |
| Plaintiff, | )<br>)<br>) | |
| v. | )<br>) | **COMPLAINT FOR DAMAGES<br>AND REINSTATEMENT** |
| FORD MOTOR COMPANY<br>c/o CT Corporation System, Statutory Agent<br>4400 Easton Commons Way Suite 125<br>Columbus Ohio 43219 | )<br>)<br>)<br>)<br>) | **JURY DEMAND ENDORSED<br>HEREIN** |
| Defendant. | ) | |

Plaintiff, Tremain Hall, by and through undersigned counsel, as his Complaint against Defendant, states and avers the following:

**PARTIES AND VENUE**

1. Hall is a resident of the city of Lima, county of Allen, state of Ohio.

2. Ford Motor Company ("Ford") is a foreign corporation licensed and registered to do business in Ohio.

3. At all relevant times, Ford has met the definition of an "employer" under all applicable statutes.

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Mobley is alleging federal law claims regarding the deprivation of Mobley's rights under Title VII.

5. This Court has supplemental jurisdiction over Mobley's state law claims pursuant to 28 U.S.C. § 1367, as Mobley's state law claims are so closely related to his federal law claims

that they form part of the same case or controversy under Article III of the United States Constitution.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

7. Within 300 days of the conduct alleged below, Hall filed a Charge of Discrimination with the Equal Opportunity Employment Commission ("EEOC"), Charge No. 471-2021-02385, against Defendant.

8. On or about July 22, 2021, the EEOC issued and mailed a Notice of Right to Sue letter to Hall.

9. Hall received his Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1), which has been attached hereto as Exhibit 1.

10. Hall filed this Complaint within 90 days of the issuance of his Notice of Right to Sue letter.

11. Hall has properly exhausted his administrative remedies pursuant to 29 C.F.R. § 1614.407(b) and O.R.C § 4112.052(B)(2).

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## FACTS

13. Hall is a former employee of Defendant.

14. Hall is African American.

15. Hall was first hired by Defendant on or about September 11, 2017 as an Assembly Worker.

16. At all times referenced herein, Hall worked at Defendant's Lima, Ohio Engine Plant ("Lima Plant").

17. Hall was a member of the United Auto Workers Local 1219 ("Union").

18. Hall was hired in by Defendant under a Union training program in which new hires transitioned to different levels or stages as they completed more training and demonstrated competence ("Transition Program").

19. As Hall made progress in the Transition Program, he received bonuses called for in the Union's Collective Bargaining Agreement ("CBA").

20. Hall was not subjected to any discipline during his first year of employment.

21. Hall was never late to work during his first year of employment.

22. At all times referenced herein, Hall had long hair.

23. Defendant does not have any policies or procedures that forbids Assembly Workers from having long hair.

24. Defendant requires Assembly Workers with long hair to tie their hair up in a bun or ponytail for safety reasons while working on the Assembly Line ("Hair Policy").

25. The Hair Policy generally stated that an Assembly Worker's hair should not extend past the collar of their shirt.

26. At all times referenced herein, Hall kept his long hair tied up in a bun at the back of his head, (near the back of his neck) when he worked.

27. At all times referenced herein, Hall complied with Defendant's policies for Assembly Workers with long hair.

28. On or about September 22, 2018, Hall was late to work for the first time since he began working for Defendant.

29. Hall had called in when he knew he was going to be late and spoke with a manager (known as a "Senior Process Coach") named Kevin (last name unknown).

30. Kevin told Hall that when he arrived to work he would need to turn his Union card in.

31. Hall understood turning a Union card to mean he was going to be terminated.

32. When Hall arrived to work, Kevin told him that "there is nothing I can do now" and to report to Human Resources.

33. Based on Kevin's statements, Hall reasonably believed that Kevin had arranged for him to be terminated.

34. Kevin treated Hall like he was going to be terminated in order to cause Hall to experience dread and anxiety ("Bullying")

35. Hall did not engage in Bullying conduct toward non-African American employees.

36. Kevin engaged in Bullying towards Hall because Hall is African American.

37. Hall reported to Human Resources as directed by Kevin.

38. Defendant's Human Resources representative, Ray (last name unknown) assured Hall he was not going be terminated for being late only one time because he had a good attendance record.

39. Defendant's Human Resources representative (name unknown) told Hall he could return to work.

40. Upon returning to the Assembly Line, Hall saw Kevin talking to another foreman (Process Coach) named Michelle.

41. Michelle is Caucasian.

42. Kevin exclaimed "oh, you're still here?" in apparent confusion when he saw that Hall had been permitted to return to work.

43. Kevin made it clear with his facial expressions and body language that he was unhappy that Hall had been permitted to return to work rather than being terminated.

44. Kevin did not permit Hall to return to work immediately and made him sit and wait to be assigned to an Assembly Line.

45. Shortly thereafter, Kevin and Michelle directed an African American named Latita (spelling uncertain; last name and position unknown) to approach Hall about his hair.

46. Latita told Hall that Kevin and Michelle wanted him to tie up his "dreadlocks" to sit on top of his head, instead of at the back of his neck ("Hair Harassment")

47. Hall was in disbelief at the Hair Harassment; Kevin and Michelle did not tell Caucasian employees with long hair that they had to wear their hair on top of their head.

48. Michelle had long hair tied up in a ponytail that touched her shirt collar.

49. Hall's hair was not as long as Michelle's or that of several other Caucasian employees.

50. It was uncomfortable for Hall to wear his hair on top of his head because it was heavy and would not stay tied up if it was on top of his head.

51. It was uncomfortable for Hall to wear his hair on top of his head because styling it in that way would cause painful pulling at the roots.

52. Kevin and Michelle singled Hall out for his hair because Hall is African American.

53. Hall immediately protested being singled out because of his hair and told Kevin and Michelle that he thought they were singling him out because of his race.

54. Hall asked Kevin and Michelle why they weren't pulling Caucasians off the Assembly Line with long hair that tied behind their head, rather than on top of it.

55. Hall pointed out to Michelle that her hair was touching her shirt collar and was not on top of her head.

56. Hall was angered at being pulled off the Assembly Line and sought to immediately complain to the Union.

57. Hall sought to file a grievance with the Union over the fact that he was being harassed about his hair while similarly-situated, non-African Americans were not.

58. Hall spoke with Matt (last name unknown), a Union representative.

59. As Hall and Matt were discussing the discrimination against Hall, they were approached by Shawn Stewart, the Plant Manager.

60. Hall complained to Stewart that he was being singled out.

61. Hall complained to Stewart that there were "white people" who were permitted to wear longer hair than his behind their heads.

62. Hall showed Stewart photos he had taken with his phone of Caucasians with long hair who were permitted to wear it beyond their collar without consequence.

63. Hall complained to Stewart that he was being discriminated against because of his race.

64. Hall asked Stewart to talk to Kevin and Michelle about how they were treating him.

65. Hall told Stewart that the way Kevin and Michelle had treated him differently than Caucasian employees made him feel "inferior."

66. Stewart responded to Hall by telling him that he didn't "have the answer for it" and by telling him "I'm not sure that constitutes harassment, you should make a statement to HR" (human resources) and by indicating that he was going to talk to Kevin and Michelle.

67. Subsequently, Hall complained to a Human Resources employee named Maria (last name unknown), as directed by Stewart ("September 2018 Discrimination Complaint").

68. Subsequent to his complaints about race discrimination to Stewart and Maria, Hall was treated differently and retaliated against.

69. Subsequent to Hall's complaints about race discrimination to Stewart and Gilbert, managers for Defendant, including Kevin and Michelle, became cold towards Hall and subjected him to heightened scrutiny, looking for any mistakes by Hall that could be used to justify harassing him.

6

70. In or around November of 2018, Hall filed a charge of discrimination with the EEOC in which he complained about the Hair Harassment and detailed what he reasonably believed was retaliation by Defendant's managers ("2018-2019 EEOC Charge").

71. A true and accurate copy of Hall's 2018-2019 EEOC Charge is attached hereto as Exhibit "B."

72. The retaliation against Hall escalated after Defendant learned of his 2018-2019 EEOC Charge.

73. Subsequent to Hall's 2018-2019 EEOC Charge, a human resources employee who had been involved in Hall's September 2018 Discrimination Complaint, Maria began to travel to the Assembly Line Hall worked on and to again harass Hall about his hair.

74. As a Human Resources employee, Maria had no reason to be on the Assembly Line.

75. Maria went to Assembly Line for the express purpose of harassing Hall.

76. Maria harassed Hall in order to retaliate against him for making the September 2018 Discrimination Complaint.

77. Maria harassed Hall in order to retaliate against him for making filing the 2018-2019 EEOC Charge.

78. Hall continued to progress in the Transition Program throughout 2019 and 2020.

79. In or around the summer of 2020, Hall obtained the final certification he required to transition to a full-time employee with full benefits ("Final Certification").

80. The CBA calls for employees who complete the Transition Program to receive a $0.40 hourly pay raise.

81. The CBA calls for employees who complete the Transition Program to receive a one-time $3,000.00 bonus.

82. Upon information and belief, Kevin and/or Gilbert were responsible for ensuring that Hall received his raise and bonus.

83. Defendant failed to raise Hall's pay as required by the CBA.

84. Defendant failed to raise Hall's pay in order to retaliate against Hall for his 2018-2019 EEOC Charge.

85. Defendant failed to raise Hall's pay in order to retaliate against Hall for his September 2018 Discrimination Complaint.

86. Defendant failed to pay Hall the bonus he was entitled to.

87. Defendant failed to pay Hall the bonus he was entitled in order to retaliate against Hall for his 2018-2019 EEOC Charge.

88. Defendant failed to pay Hall the bonus he was entitled in order to retaliate against Hall for his September 2018 Discrimination Complaint.

89. Between the summer of 2020 and March of 2021, Hall repeatedly complained to Defendant about its failure to raise his pay and to pay him his bonus.

90. Between the summer of 2020 and March of 2021, Hall filed one or more grievance through his Union regarding Defendant's failure to raise his pay and to pay him his bonus.

91. In response to Hall's complaints about his pay, Defendant reduced Hall's pay.

92. Defendant reduced Hall's pay in order to retaliate against Hall for his September 2018 Discrimination Complaint.

93. Defendant reduced Hall's pay in order to retaliate against Hall for 2018-2019 EEOC Charge.

94. In or around November of 2020, Hall attempted to Complaint to Stewart again about the retaliation he believed he was experiencing.

95. Stewart responded to Hall by telling him that he "needs to shut up about this harassment crap and let it go" if he wanted the retaliation to stop.

96. Stewart blamed Hall for the retaliation he was experiencing.

97. Stewart threatened Hall that if he did not "shut up," he would experience more harassment and targeting.

98. In or around November or December of 2020, Hall attempted to raise his concerns about Defendant's failure to raise his pay and to pay him his bonus to Stewart during a "Town Hall" meeting ("Town Hall Complaint").

99. Hall complained that he thought that Defendant had failed to raise his pay or pay his bonus because he was being retaliated against.

100. Stewart told Hall that he was "not getting into it" during the Town Hall because Hall had "an open charge"

101. Stewart was referring to Hall's 2018-2019 EEOC Charge when he stated that Hall had an "open charge."

102. Stewart was incorrect; Hall's 2018-2019 EEOC Charge had been closed by the EEOC in or around March of 2019.

103. Subsequently, the Union was able to force Defendant to pay Hall his bonus and to correct his pay.

104. The Union further demanded that Defendant pay Hall interest on his delayed bonus.

105. Starting in or around 2020, Defendant would occasionally idle portions of its Lima Plant due to staffing and/or parts shortages caused by the Covid-19 pandemic ("Covid Related Closures").

106. Hall was laid off and/or placed off work from time to time during 2020 and 2021 due to Covid Related Closures.

107. Hall and other employees effected by Covid Related Closures were entitled to receive unemployment benefits when they were off from work.

108. During 2020, and into 2021, Hall had an open unemployment claim.

109. When Hall was prevented from going to work due to a Covid Related Closure, he would file for unemployment benefits.

110. It was not a violation of any policy of Defendant for employees like Hall to seek unemployment benefits when they were off work through no established fault of their own.

111. In or around February of 2021, Hall received a phone call from Gilbert, who told Hall that he should not come in to work.

112. Gilbert told Hall that Defendant was investigating allegations that he had threatened another employee outside of work ("Investigation").

113. Gilbert told Hall it was "not safe" for him to come to work.

114. Hall had not threatened anyone.

115. The allegation that Hall had threatened someone was false.

116. Hall asked Gilbert when he would be able to return to work.

117. Gilbert told Hall he did not know but was going to talk to Stewart and would follow up with Hall to let him know.

118. Gilbert did not tell Hall that he was being suspended; just not to return to work until he heard back from Gilbert.

119. Gilbert did not follow up with Hall.

120. Subsequently, Hall followed up with Gilbert by phone to find out when he could return to work.

121. Gilbert responded to Hall by telling him that he did not know and that the Investigation was ongoing.

122. Frustrated about being kept out of work without pay, Hall told Gilbert he thought he was being retaliated against for his prior complaints about discrimination and his 2018-2019 EEOC Charge.

123. Frustrated about being kept out of work without pay, Hall told Gilbert he thought he was being retaliated against for his complaints about not receiving his raise or bonus because of retaliation.

124. Frustrated about being kept out of work, Hall told Gilbert that he was going to file a grievance with the Union and another EEOC charge.

125. Gilbert responded to Hall's complaint and about retaliation by warning Hall "don't threaten me with the EEOC."

126. Gilbert ended the call with Hall without providing any further specifics about when Hall could expect to return to work.

127. Hall remained out of work involuntarily without pay while the Investigation continued.

128. Because Hall was out of work through no established fault of his own, Hall claimed unemployment benefits while he was being held out of work by Defendant.

129. Because Hall had not been found by Defendant to have done anything wrong, it was not a violation of any law or policy of Defendant for Hall to claim unemployment benefits until he could return to work.

130. The Investigation failed to substantiate that Hall had threatened anyone.

11

131. Upon the conclusion of the Investigation, Gilbert contacted Hall and notified him that Defendant was investigating whether he had committed "fraud" by collecting unemployment while he was suspended.

132. Hall was surprised to hear that he had been suspended.

133. Hall had never previously been told he was suspended.

134. Had Hall been suspended, he would have been entitled to Union representation to oppose any such suspension.

135. If Hall had been suspended, Defendant violated the CBA by enacting the suspension over the phone without a hearing or Union representation.

136. In reality, Hall had not been "suspended" as that term is defined by Defendant's policies or by the CBA.

137. Hall had not committed fraud; his collecting unemployment was permissible under the circumstances.

138. Unable to support terminating Hall for allegedly threatening another employee, Defendant shifted to Hall's receipt of unemployment benefits during his forced time off as a means of justifying Hall's termination.

139. On or about May 7, 2021, Defendant terminated Hall.

140. Gilbert notified Hall of his termination during a meeting ("Termination Meeting").

141. Gilbert told Hall that he had violated Defendant's rules by collecting unemployment while on "suspension."

142. Hall was represented by the Union during the Termination Meeting.

143. The Union opposed Hall's termination.

144. During the Termination Meeting, both Hall and the Union asked where Defendant had published a rule that prevented Hall from collecting unemployment under the circumstances.

145. Gilbert could not point to any rule of Defendant that Hall had violated by collecting unemployment.

146. In reality, Hall had not violated any rule of Defendant.

147. Upon information and belief, other employees of Defendant who had not complained of unlawful discrimination and harassment were treated favorably under similar circumstances.

148. Upon information and belief, other employees of Defendant who had not complained of unlawful discrimination and harassment were not terminated for collecting unemployment when they were suspended from work.

149. In reality, Hall was terminated in retaliation for his multiple complaints of discrimination and retaliation throughout his employment with Defendant.

150. Hall had last complained of unlawful retaliation only a few weeks prior to his termination when he told Gilbert he was going to file another EEOC charge.

151. Upon information and belief, Hall was subject to a progressive disciplinary policy.

152. Defendant violated its own progressive disciplinary policy when it terminated Hall.

153. As a direct and proximate result of Defendant's conduct, Hall suffered and will continue to suffer damages, including economic and emotional distress damages.

## COUNT I: RETALIATORY WRONGFUL TERMINATION IN VIOLATION OF 42 U.S.C. § 2000e-3(a).

154. Hall re-alleges and incorporates by reference the allegations set forth in paragraphs 1-153 above.

155. Hall engaged in protected activity when opposed racial harassment and discrimination while employed by Defendant.

156. As a result of Hall's opposing racial harassment and discrimination, Defendant and its agents escalated their harassment and mistreatment of Hall.

157. As a result of Hall's opposing racial harassment and discrimination, Defendant and its agents took disciplinary action against Hall.

158. As a result of Hall's opposing racial harassment and discrimination, Defendant terminated his employment.

159. There was a causal connection between Hall's complaints and the materially adverse actions taken against Hall by Defendant and its agents.

160. The retaliation endured by Hall would dissuade a reasonable employee from making complaints of discrimination and harassment.

161. Defendant retaliated against Hall for engaging in protected activity in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

162. Defendant's retaliation against Hall violated the rights secured to Hall by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq., as amended by the Civil Rights Act of 1991.

163. By the retaliatory conduct described above, Defendant intentionally violated Hall's rights under Title VII.

164. As a result of the violation of Hall's Title VII rights, Hall is entitled to equitable and injunctive relief, including "rightful place" and "make whole" remedies and equitable monetary relief, to remedy and compensate for the effects of Defendant's unlawful actions.

165. In their retaliatory actions as alleged above, Defendant has acted with malice or reckless indifference to Hall's rights, thereby entitling Hall to an award of punitive damages.

166. To remedy the violation of Hall's rights secured by Title VII, Hall request that the Court award him the relief prayed for below.

**COUNT II: RETALIATORY WRONGFUL TERMINATION IN VIOLATION OF R.C.§ 4112.02(I)**

167. Hall re-alleges and incorporates by reference the allegations set forth in paragraphs 1-167 above.

168. Hall engaged in protected activity when opposed racial harassment and discrimination while employed by Defendant.

169. As a result of Hall's opposing racial harassment and discrimination, Defendant and its agents escalated their harassment and mistreatment of Hall.

170. As a result of Hall's opposing racial harassment and discrimination, Defendant and its agents took disciplinary action against Hall.

171. As a result of Hall's opposing racial harassment and discrimination, Defendant terminated his employment.

172. There was a causal connection between Hall's complaints and the materially adverse actions taken against Hall by Defendant and its agents.

173. The retaliation endured by Hall would dissuade a reasonable employee from making complaints of discrimination and harassment.

174. Defendant retaliated against Hall for engaging in protected activity in violation of R.C.§ 4112.02(I).

175. Defendant's retaliation against Hall violated the rights secured to Hall by R.C.§ 4112.02(I).

176. By the retaliatory conduct described above, Defendant intentionally violated Hall's rights under R.C.§ 4112.02(I).

177. As a result of the violation of Hall's R.C.§ 4112.02(I) rights, Hall is entitled to equitable and injunctive relief, including "rightful place" and "make whole" remedies and equitable monetary relief, to remedy and compensate for the effects of Defendant's unlawful actions.

178. In their retaliatory actions as alleged above, Defendant has acted with malice or reckless indifference to Hall's rights, thereby entitling Hall to an award of punitive damages.

179. To remedy the violation of Hall's rights secured by R.C.§ 4112.02(I)., Hall request that the Court award him the relief prayed for below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Tremain Hall requests judgment in his favor against Defendant, containing the following relief:

(a) An order directing Defendants to place Hall in the position he would have occupied but for Defendants' discriminatory, retaliatory and/or otherwise unlawful treatment of him, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Hall;

(b) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Hall for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

(c) Awarding against each Defendant compensatory and monetary damages to compensate Hall for lost wages, emotional distress, and other consequential damages, in an amount to be proven at trial;

(d) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Hall for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

(e) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Hall for harm to his professional and personal reputation and loss of career fulfillment;

(f) An award of damages for any and all other monetary and/or non-monetary losses suffered by Hall in an amount to be determined at trial, plus prejudgment interest;

(g) An award of punitive damages;

(h) An award of costs that Hall has incurred in this action, as well as Hall's reasonable attorneys' fees to the fullest extent permitted by law; and

(i) Awarding such other and further relief that this Court deems necessary and proper.

Respectfully submitted,

*/s/Christopher P. Wido*_____
Chris P. Wido (0090441)
**THE SPITZ LAW FIRM, LLC**
25200 Chagrin Boulevard, Suite 200
Beachwood, OH 44122
Phone: (216) 291-4744
Fax:   (216) 291-5744
Email: chris.wido@spitzlawfirm.com

*Attorney For Plaintiff Tremain Hall*

## JURY DEMAND

Plaintiff Tremain Hall demands a trial by jury by the maximum number of jurors permitted.

*/s/Christopher P. Wido*_____
Chris P. Wido (0090441)
**THE SPITZ LAW FIRM, LLC**